No. 2691

Second Circuit

LEDNER v. CADDO TRANSFER & WAREHOUSE CO. ET AL.

(November 18, 1929. Opinion and Decree.)

D. C. Scarborough and Melvin F. Johnson, of Shreveport, attorneys for plaintiff, appellant.

Cook & Cook, of Shreveport, attorneys for defendant, appellee.

REYNOLDS, J. Plaintiff instituted two suits, one against the Houston & Shreveport Railroad Company and the other against the Caddo Transfer & Warehouse Company; the object of each suit being the same, namely, to obtain judgment for $558, with legal interest thereon from judicial demand, as and for the value of certain personal property, namely, an Oriental rug alleged to be worth $225, a black colored overcoat alleged to be worth $65, a suit of clothes alleged to be worth $55, another suit of clothes alleged to be worth $38, a woman's coat with fur collar and fur sleeves alleged to be worth $75, a lot of linen alleged to be worth $75, and a small coat alleged to be worth $25.

In his suit against the railroad company, he alleged that he had delivered to its connecting carrier in New York, N. Y., nineteen packages for transportation and delivery to him at Shreveport, La., three of which packages were cases and one of which cases contained the articles whose value is sued for; that the connecting carrier had delivered all of the nineteen packages to the Houston & Shreveport Railroad Company for transportation and delivery to him at Shreveport, La., and that the last-named carrier only had delivered to him eighteen of the packages and had failed to deliver to him the case containing the articles whose value was sued for notwithstanding demand.

The railroad company denied that it had failed to deliver any of the packages, and alleged that it had delivered to plaintiff's agent, the Caddo Transfer & Warehouse Company, all nineteen of them.

In his suit against the Caddo Transfer & Warehouse Company, plaintiff alleged that it had received from his agent nineteen packages of goods for storage for his account until called for by him, and that it had only delivered eighteen of them to him, and had failed to deliver one package containing the articles whose value was sued for notwithstanding amicable demand.

The transfer and warehouse company denied that it had received nineteen packages from the railroad company or that it had failed to deliver any package to plaintiff, and, on information and belief, alleged that the number of packages delivered by plaintiff to the initial carrier was less than nineteen.

The two suits were consolidated for purposes of trial, and were tried, and, during the progress of the trial, plaintiff dismissed

his suit against the Houston & Shreveport Railroad Company.

Judgment was rendered in favor of the Caddo Transfer & Warehouse Company, dismissing the plaintiff's suit against it, and the plaintiff appealed.

## OPINION
### Estoppel

At the beginning of the trial in the district court the Caddo Transfer & Warehouse Company objected to the admission of any evidence in support of the petition against it on the ground that plaintiff was estopped to urge that it had received from the railroad company and failed to deliver to him the case of goods in question by reason of the fact that in his suit against the railroad company he had alleged that it had received and failed to deliver to him or his agent the same case of goods.

The objection was overruled, and the transfer and warehouse company reserved an exception to the ruling, and in this court the objection and ruling are urged as ground for reversal of the judgment appealed from.

We think the objection was properly overruled.

The allegation in the suit against the railroad company did not cause the transfer and warehouse company to change its position to its detriment, and therefore did not estop plaintiff to allege and prove that it had delivered the case of goods to the transfer and warehouse company.

In Appalachian Corporation v. Brooklyn Cooperage Co., 151 La. 41, 91 So. 539, 541, the former sued the latter to recover the amount of a judgment obtained against it by an employee of the latter for injuries sustained by him by a door of a building bought by the Appalachian Corporation from the Cooperage Company and still in the latter's possession at the time of the injury falling on the employee. The Appalachian Corporation alleged that the Cooperage Company, being in possession of the building, knew or should have known of the danger of the door falling, and was negligent in permitting the condition to exist, and the Cooperage Company pleaded that the Appalachian Corporation was estopped to allege that the door was in a dangerous condition because of the fact that it had in the suit of the employee against it denied that the door was in such condition. And the Supreme Court, dealing with the contention, said:

"Plaintiff has gained no advantage over the defendant by such defense, nor has defendant's situation been altered to its detriment. But aside from all of this, parties are not bound by judicial allegations of facts which terminate unsuccessfully."

## ON THE MERITS

Plaintiff testified:

"Q. Did you go into the warehouse sometime before this stuff was delivered to you by the Caddo Transfer & Warehouse Company?

"A. Yes, sir.

"Q. Did you have your stuff gathered together there, in the warehouse and go over it yourself?

"A. Yes, sir.

\*　　\*　　\*　　\*

"Q. How many pieces did you check and find there?

"A. Nineteen.

"Q. Were all three of the cases of household goods \* \* \* did you find them there in the warehouse of the Caddo Transfer & Warehouse Company at the time that you checked them?

"A. Yes, sir."

R. C. Epps, called by plaintiff, testified that, at the time the shipment was delivered by the railroad company to the transfer and warehouse company he was in the employ of the railroad company as check clerk, and in that capacity he checked the shipment out of the car in which it ar-

rived into the railroad company's freight warehouse in Shreveport.

A document, which we do not find in the record, was shown the witness, and he was asked what it was, and he said:

"This is the delivery for freight to the Caddo Transfer & Warehouse company and the same sheet that I checked the goods out of the car into the warehouse (on) these nineteen check marks cover the nineteen pieces checked out of the car into the warehouse.

"Q. You checked them from the railroad car to the railroad warehouse?

"A. Yes, sir; checked nineteen pieces.

\* \* \* \*

"Q. You had nothing to do with checking it out to the Caddo Transfer & Warehouse Company?

"A. No, sir; but I went and called attention to the fact—I wanted to call attention to the fact that on there, you will see that on August 25th, that the auditor, in making a check, also checked nineteen pieces as in the warehouse.

\* \* \* \*

"Q. Did you see Mr. Adams sign this document?

"A. No, sir.

"Q. Do you know if this penciled memorandum "one extension table" was on there when you checked it?

"A. I have an idea it was not. Mr. Ellington delivered the shipment."

C. T. Ellington testified that he was the warehouse foreman of the Houston & Shreveport Railroad Company at Shreveport and in that capacity had delivered the shipment to the transfer and warehouse company. He was shown a document and asked what it was, and he stated that it was the receipt received by the railroad company on delivery of the shipment.

"Q. Who gave that receipt?

"A. I had the Caddo Transfer & Warehouse Company's driver to sign this receipt.

"Q. Who?

"A. Mr. Adams."

He further testified that he checked the delivery and that nineteen pieces were delivered and that he saw Mr. Adams sign the receipt. He further testified that he remembered making the delivery and remembered that the delivery included three boxes, one of which appeared to weigh two or three hundred pounds and that the two others were small.

We find in the record, as Plaintiff's Exhibit 5, a partly printed and partly typewritten document on which is printed "Receipt for Delivery of Freight" and purporting to be a receipt given to the Houston & Shreveport Railroad Company by the Caddo Transfer & Warehouse Company for the shipment in question. It reads as follows:

Receipt for Delivery of Freight

Consignee Chas Ledner                                              Shreveport, La. 8/25/24
Destination                              Route                              Freight Bill 19668
Received of Houston & Shreveport Railroad Company the following described articles in good order:

| Waybilled from New York N Y Point and date of Shipment | Waybill Date and No. NE 156 8/16/24 Connecting Line reference. | Full Name of Shipper Chas Ledner Previous Waybill reference. | Car Initials and No. LW 58697 Original car initials and No 90L 179 |
|---|---|---|---|

| Number of packages, articles and marks. | Weight | Rate | Freight | Advances | Total |
|---|---|---|---|---|---|
| 1 wood bed 3 cs HH GDS 1 China Closet 1 cedar chest 1 "2 arm chair 1 sofa 1 IR bed crt 1 Kitchen ct 1 picture 4 brls 1 dresser ct 1 trunk 1 baby carriage ct     1/19 | 3880 | 207 | 80  32 | | Prepaid |

Location                                8/27    1924                    Total———
Warehouse Post or Section          Consignee                          Prepaid
OH 8/25                                  Adams
Delivered by Caddo Trfr             Per———                          To Collect

Plaintiff's theory is supported by this receipt, which, though it only specifies eighteen packages as received, yet by the addition of "1/19" immediately after the description of the character of the packages shows that nineteen packages were actually received.

S. H. McCall testified that he was secretary and treasurer of the Caddo Transfer & Warehouse Company, explained this receipt:

"Q. Didn't you contend at the time that you had received his three cases of goods and that the receipt said so?

"A. No, I did not. I can tell you just this. We delivered eighteen pieces, and that eighteen pieces, according to this list, was all that we got from the railroad company.

"Q. You however admit that Mr. Adams has signed this document for your company?

"A. Mr. Adams signed it.

"Q. In case the extension table was not listed, it don't show that it was on this receipt?

"A. This was on the table at the time that Mr. Ledner came in. After we went over the bill of lading with him I said: 'Mr. Ledner, the extension table don't show on the freight bill', and he said: 'I received it.'

\* \* \* \*

"Q. Is not that a receipt for nineteen pieces?

"A. It is not.

"Q. Why is it not?

"A. Only eighteen pieces are listed on there.

"Q. Don't it say nineteen pieces there, at the bottom?

"A. No, sir; it says from 'one to nineteen.'

"Q. What do you think that is, then?

"A. It is numbered from 'one to nineteen.'

"Q. Then you think that only eighteen pieces, numbered from 'one to nineteen' and one box was listed at two?

"A. No, sir; we did not sign for the number; we signed for the cases.

"Q. What does that customarily mean, those tallies up there?

"A. That means check marks of the number of pieces that go out.

"Q. Don't that indicate nineteen pieces?

"A. That would indicate that nineteen pieces had been checked off of the bill.

"Q. So that you say, because eighteen pieces were described specifically, you say there were eighteen pieces?

"Q. Even though it says nineteen and the tallies are there for nineteen?

"A. Yes, sir, a tally for nineteen; I do not know who put that there; I don't know who it was who numbered them from 'one to nineteen'; I don't know what it represents; I suppose it represents the number of pieces.

"Q. Do you find any extension table listed in there?

"A. I do not.

"Q. Don't you find an extension table listed on the bill of lading?

"A. Yes, sir.

"Q. How do you explain that?

"A. Well, that is the railroad man's experience; I don't know why they dropped the extension table in making out the freight bill.

"Q. You are willing to stand on the receipt and say that you only received eighteen pieces?

"A. I don't say that; I say that we received eighteen pieces to the best of my knowledge and belief.

"Q. And upon that, you are willing to swear that you delivered everything, except the extension table?

"A. No, sir; I say that we delivered eighteen pieces; what those were, I don't know.

\* \* \* \*

"Q. Mr. McCall, you swear that you delivered these goods to Mr. Ledner?

"A. No, sir; I did not check them or make a delivery myself.

"Q. So that you don't know if they were delivered to Mr. Ledner?

"A. I don't know; I know that we delivered eighteen pieces, according to this receipt."

The receipt, Plaintiff's Exhibit 5, describes eighteen separate packages. The extension table mentioned on the bill of lading is not included in the eighteen pieces described on the receipt. However, the warehouse and transfer company also received this table from the railroad company, as it delivered the table to plaintiff. Therefore the warehouse and transfer company must have received nineteen pieces from the railroad company.

R. A. Ford testified that he was foreman of the warehouse and transfer company's warehouse No. 3, and that:

"Q. Were you present when Mr. Ledner and your men separated this shipment?

"A. Yes, sir; I helped him.

\* \* \* \*

"Q. Did he seem satisfied?

"A. He seemed satisfied as to the numbers; the only thing he found one of them split up; this particular crate or box he noticed that it was broken some.

\* \* \* \*

"Q. Did you count the cases when Mr. Ledner came there?

"A. No, sir.

"Q. How did you know, then, when you all had finished segregating Mr. Ledner's goods?

"A. I didn't know.

"Q. Did he leave satisfied that it was separated?

"A. I suppose he did; didn't say anything about it.

"Q. He didn't say anything about one piece being short?

"A. No, sir; he didn't say a word."

W. L. Adams testified that he was the person who had receipted to the railroad company for the shipment, and that:

"Q. What were the circumstances under which you signed the receipt?

"A. I was out there I don't know how many days, it was one or two, after the shipment was received, and Mr. Ellington made the statement that the shipment was delivered O. K. to the driver and the driver had failed to sign, and asked me to sign it, which I did, as it had been customary for years.

"Q. How many days after the delivery was that?

"A. I could not state.

\* \* \* \*

"Q. Did you read this, when you signed it?

"A. I could not say that I did.

. \* \* \* \*

"Q. Didn't you see the name, C. Ledner?

"A. Probably I did see it, but I did not pay any attention to it; I took the statement from Mr. Ellington, as it was customary when he would say everything was O. K., would go ahead and sign.

"Q. Didn't you sign for nineteen pieces?

"A. I don't know; I didn't pay attention; I can't say."

Plaintiff's wife testified that the articles, whose value is sued for, were never received by her husband and she described each of the missing articles and named its value.

We have carefully read and considered the evidence, and it convinces us that the warehouse and transfer company did receive all of the packages mentioned in the bill of lading.

Our learned brother of the district court was of a different opinion. We regret that a written opinion was not rendered by him, as we are slow to reverse the finding of

the trial judge on an issue of fact, and should like to have had the benefit of his reasons for judgment.

The warehouse and transfer company having received nineteen packages and only delivered eighteen of them must respond to plaintiff for the value of the goods contained in the missing package, in the absence of a legal excuse for not delivering the missing package, and no such excuse has been proved in this case. Gibbons v. Y. & M. V. R. R. Co., 130 La. 671, 58 So. 505.

Counsel for the warehouse and transfer company urge that there was no contractual relation between plaintiff and it, but the evidence shows that it dealt with plaintiff as the owner of the goods and delivered to him eighteen of the nineteen packages and must be held liable for the value of the missing package.

The only evidence as to the contents of the missing package and the value of the different articles making up such contents is the testimony of plaintiff and his wife, who both swear positively that the articles listed in the petition were in the package, and that they were respectively worth the value put upon them therein. Their testimony was not disputed, and it must therefore be taken as establishing these allegations of the petition.

It is therefore ordered, adjudged, and decreed that the judgment appealed from be annulled, avoided, and reversed, and it is now ordered, adjudged, and decreed that plaintiff, Charles Ledner, do have and recover judgment against defendant Caddo Transfer & Warehouse Company for $558, with legal interest thereon from judicial demand, and costs of both courts.